**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| EMCON ASSOCIATES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civ. Action No. 16-1985 (FLW) |
| v. | : | |
| | : | |
| ZALE CORPORATION, STERLING | : | **OPINION** |
| JEWELERS INC., and JOSEPH | : | |
| ALBANESE, | : | |
| | : | |
| Defendants. | : | |

_____:

**WOLFSON, District Judge**:

Plaintiff Emcon Associates, Inc. ("Plaintiff" or "Emcon") filed this action against Defendants Sterling Jewelers, Inc. ("Sterling"), Zale Corporation ("Zales"), and Joseph Albanese ("Albanese") (collectively, "Defendants") for breach of a written contract (the "Vendor Agreement"), as well as violations of the New Jersey Consumer Fraud Act ("CFA") and the New Jersey Racketeer Influenced and Corrupt Organization Act ("RICO"). In lieu of an answer, Defendants move to stay the proceedings and compel arbitration.  In their motion, Defendants argue that Plaintiff is bound by the arbitration clause in the Vendor Agreement to arbitrate its contractual and statutory claims.  In response, Plaintiff challenges the validity of the arbitration agreement and Defendants' contractual rights to seek arbitration under that agreement.  For the reasons set forth below, the Court finds that a valid arbitration agreement between the parties exists, and therefore, Defendants' motion is **GRANTED**.

1.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff Emcon is a New Jersey corporation that provides facilities management and maintenance services. Complaint ("Compl.") ¶ 6. Defendants Sterling and Zales corporations are retail jeweler companies that operate retail stores. Since the acquisition of Zales by Signet Jewelers Limited ("Signet") on May 29, 2014, Sterling and Zales both share Signet as a corporate parent. Declaration of Bruce D. Meller (dated June 2, 2016) (hereinafter, "Meller Dec."), ¶ 3, Ex. A. Currently, Defendant Albanese is Signet's Vice-President of Store Planning. Declaration of Joseph Albanese (dated April 29, 2016) (hereinafter, "Albanese Dec."), ¶ 3. During the relevant period of time to this dispute, Albanese was the Director of Facility Maintenance for Sterling and Zales. Albanese Dec., ¶ 4; Comp. ¶ 30. His job duties included directing and managing the repair and maintenance activity for the Sterling and Zales' facilities located throughout the United States. Albanese Dec., ¶¶ 4-5.

On February 1, 2012, Emcon and Sterling entered into a written Vendor Agreement. Albanese Dec., ¶ 6, Ex. A. Pursuant to the Vendor Agreement, Emcon agreed to provide facilities management services, including plumbing, electrical, and handyman services, to jewelry locations operated by Sterling and its affiliates throughout the United States. Albanese Dec., ¶ 7. The parties agreed in the Vendor Agreement that Sterling affiliates, which, at the time of contract, included Sterling Inc., Sterling of Ohio, Inc., and Sterling Jewelers LLC, had the right to receive goods and services, as well as the right to enforce the provisions of the Vendor Agreement. Albanese Dec., ¶ 6, Ex. A, ¶ 6. In or about October 2014, at the request of Zales, Emcon began performing facilities management services for Zales stores located in the United States and Canada. Declaration of Kelly Davis (dated June 2, 2016) ¶ 5.

2

The Vendor Agreement contains a choice of law provision requiring that the Agreement be construed in accordance with Ohio law, and an arbitration clause setting forth the parties' rights and obligations in the event of a dispute. In pertinent part, the provisions state as follows:

> Each and every Order shall be construed and enforced pursuant to the laws of the State of Ohio, without giving effect to the principles of conflicts of law thereof.

> Except as otherwise provided in this Section, any and all disputes arising under each and every Order that cannot otherwise be resolved as between the parties shall be determined through binding arbitration to be determined as set forth in this Section and shall be generally conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

Albanese Dec., ¶ 6, Ex. A, ¶ 24. The Vendor Agreement also contained an "Availability of Information/Audit" provision that gave Sterling "the right to audit any and all invoices and/or charges from" Plaintiff. Albanese Dec., ¶ 6, Ex. A, ¶ 23. More specifically, the provision states that "Sterling's duly authorized representatives shall have, during the term of this Order and thereafter, access at all reasonable times to all of [Plaintiff's] and [Plaintiff's] subcontractor's, personal, accounts and records that mat be needed to verify and audit all charges to Sterling." Albanese Dec., ¶ 6, Ex. A, ¶ 23.

After Sterling and Zales purportedly became concerned with Plaintiff's invoicing, Sterling exercised its right, under the Vendor Agreement, to audit all of Plaintiff's charges. Albanese Dec., ¶¶ 10-11. Before the audit was completed, however, Plaintiff filed the instant state-court Complaint in New Jersey state court. The first four counts of the Complaint are claims for payment with regard to services that Emcon provided to Sterling and Zales, Compl. ¶¶ 5-27, while the final two counts of the Complaint assert statutory and tort claims against Defendants, averring that "Zale and Sterling, through and/or including Albanese, engage[d] in unconscionable commercial practices, deceptions, fraud and misrepresentations in violation of common law, and statutory law

including, but not limited to *N.J.S.A.* 56:8-1, *et seq.* [("NJ CFA")] and *N.J.S.A.* 2C:41-1, *et seq.* [("NJ RICO")]." Compl. ¶¶ 28-58.

In the present matter, Defendant moves to dismiss the complaint and compel arbitration, arguing that Plaintiff's claims arise under the Vendor Agreement. However, in an attempt to circumvent the Vendor Agreement's arbitration clause, Plaintiff argues, *inter alia*, that the arbitration clause is unenforceable, would result in an impermissible waiver of Plaintiff's right to litigate its statutory and common law claims, and that neither Zales nor Albanese can compel arbitration because they are not signatories to the Vendor Agreement.

## II.      STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178-79 (3d Cir. 1999) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)). The FAA was designed by Congress "'to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.'" *Beery v. Quest Diagnostics, Inc.*, 953 F. Supp. 2d 531, 536-37 (D.N.J. 2013) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). In achieving this end, the FAA provides that contract provisions containing arbitration clauses "shall be binding, allows for the stay of federal court proceedings in any matter referable to arbitration, and permits both federal and state courts to compel arbitration if one party has failed to comply with an agreement to arbitrate." 9 U.S.C. §§ 2-4. Collectively, "those provisions [of the FAA] 'manifest a liberal policy favoring arbitration agreements.'" *Beery*, 953 F. Supp. 2d at 537 (quoting *Gilmer*, 500 U.S. at 24). In that connection, "as a matter of federal law, any doubts concerning the

4

scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (*Mercury Constr. Corp.*, 460 U.S. at 24-25) (internal quotations omitted).

Although federal law presumptively favors the enforcement of arbitration agreements, when a district court is presented with a motion to compel arbitration, it must affirmatively answer the following two questions before compelling arbitration pursuant to section 4 of the FAA: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009). When performing this inquiry, the Court applies "ordinary state-law principles that govern the formation of contracts," *Kirleis v. Dickie, McCamey & Chilcote*, 560 F.3d 156, 160 (3d Cir. 2009), and, when determining whether [a] particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Century Indem. Co*, 584 F.3d at 524 (citing *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986)).

## III.    ANALYSIS

### A.    Ohio Law Governs This Dispute

As a preliminary matter, the Court notes that the Vendor Agreement expressly states that the parties selected Ohio law[1] to govern the interpretation of the contract. Indeed, the first sentence

---

[1]     Although Ohio law governs this dispute, the Court will, nonetheless, apply New Jersey procedural law, where appropriate. *N. Bergen Rex Transp. v. Trailer Leasing Co.*, 158 N.J. 561, 569 (1999) (finding that "the procedural law of the forum state applies even when a different state's substantive law must govern.") (citations omitted).

of the Vendor Agreement's arbitration provision states as follows: "Each and every Order[2] shall be construed and enforced pursuant to the laws of the State of Ohio, without giving effect to the principles of conflicts of law thereof." Albanese Dec. ¶ 6, Ex. A, ¶ 24. Therefore, the Court will honor the parties' choice of law agreement, and apply Ohio law in resolving this dispute. *N. Bergen Rex Transp.*, 158 N.J. at 568 ("'Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy.'") (citing *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 341 (1992)).

Plaintiff, nonetheless, argues that New Jersey law should apply, despite the arbitration agreement's choice of law clause, because: (1) it has asserted violations of New Jersey statutes, including CFA and RICO claims; and (2) New Jersey has a "pervasive interest" in protecting its citizens from fraudulent practices against out of state corporations, such as Defendant. Plaintiff's Opposition to Defendants' Motion ("Pl's Opposition Brief"), at 17. Neither of these arguments are persuasive.

First, while Plaintiff correctly notes that the Vender Agreement's choice of law provision does not contain language that prevents Plaintiff from asserting claims under New Jersey statutory law, the assertion of these statutory claims is irrelevant to the Court's choice of law analysis *vis-à-vis* the choice of law provision in the Vendor Agreement. Indeed, the issue to be resolved here is not whether the Vendor Agreement bars Plaintiff from filing statutory claims under New Jersey law; rather, the parties' primary dispute concerns whether the Vendor Agreement's arbitration

---

[2]   Plaintiff incorrectly argues that the term "Order" pertains to the individual service order forms, as opposed to the Vendor Agreement. However, pursuant to the parties' contract, the term "Order" is defined as the Vendor Agreement. *See* Albanese Dec., ¶ 6, Ex. A, ¶ 1 ("Vendor has read and understands this contract ('Order') . . . . ").

provision is valid and enforceable, and whether said provision is binding upon Sterling and Albanese, non-signatories to the contract. In making these determinations, Plaintiff's assertions of statutory claims under New Jersey law has no relevance to the Court applying Ohio law to contract-related claims arising out of the Vendor Agreement, as specified by the choice of law provision. *See, e.g.*, *Zavecz v. Yield Dynamics, Inc.,* 179 Fed. Appx. 116, 120 (3d Cir. 2006) (holding that "a court's application of one state's law to one issue in a case does not preclude the court from deciding that another state's law governs another issue in the same case") (citing *Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006)); *Blain v. Smithkline Beecham Corp.,* 240 F.R.D. 179, 194 (E.D. Pa. 2007). Therefore, the Vendor Agreement's choice of law provision cannot be invalidated simply based on Plaintiff's inclusion of New Jersey CFA and RICO claims.

Second, Plaintiff, without addressing the appropriate standard, essentially argues that the Court should invalidate the parties' choice of law provision, because it is a violation of New Jersey's public policy. Pl's Opposition Brief, at 17-18. In support, Plaintiff inappropriately relies on *Eastman v. First Data Corp.*, 292 F.R.D. 181 (D.N.J. 2013); *Eastman*, however, is easily distinguishable from this case, as it does not discuss contractual choice of law provisions.[3] Rather, according to the *Restatement*, the factors to consider in deciding whether to uphold a contract's choice of law provision are as follows:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which would be the state of the applicable law in the absence of an effective choice of law by the parties.

---

[3]     The issue in *Eastman* primarily concerned whether the commonality requirement of Fed. R. Civ. P. 23(a)(2) was satisfied in a putative class action by plaintiff New Jersey merchants against defendant providers of credit card point-of-sale-terminals.

*N. Bergen Rex Transp.*, 158 N.J. at 568-69 ((citing *Instructional Sys.*, 130 N.J. at 342) (quoting *Restatement (Second) of Conflicts of Laws* § 187 (1969)).

In the instant matter, Plaintiff asserts that the Vendor Agreement's choice of law provision cannot be enforced, because both Sterling and Zales do not have "significant contacts with Ohio." Pl's Opposition Brief, at 18. Plaintiff, however, is mistaken. New Jersey courts have held that the substantial relationship test, under the first factor of the *Restatement*, is satisfied where a contract's choice of law agreement has selected the substantive law of the state in which one of the parties is incorporated. *See N. Bergen Rex Transp.*, 158 N.J. at 569 ("The substantial relationship standard under the *Restatement* has been met in the present case because [Defendant Corporation] is headquartered in Illinois."); *see also Prescription Counter v. AmerisourceBergen Corp.,* No. 04-5802, 2007 U.S. Dist. LEXIS 84102, at *29 (D.N.J. Nov. 9, 2007) (holding that, although Plaintiff Corporation "is incorporated in New Jersey and the parties executed [their Agreement] in New Jersey, [Defendant Corporation's] principal place of business is in Georgia. Accordingly, Georgia has a substantial relationship to the parties and the transaction, and there is a reasonable basis for the parties' choice of law."). Thus, the substantial relationship test has been satisfied here, because Sterling is headquartered in Ohio.

With regard to the *Restatement's* second factor, Emcon argues that New Jersey has a substantially greater interest than Ohio in connection with this dispute, because Emcon "performed work under its agreements for stores located in New Jersey." Pl's Opposition Brief, at 18. However, while Emcon may have serviced stores in New Jersey, under the Vendor Agreement, Emcon also "agreed to provide goods and services . . . for retail jewelry locations operated by Sterling and Zale *throughout the United States.*" Albanese Dec., ¶ 7 (emphasis added). Significantly, Emcon's obligations under the Vendor Agreement did not solely pertain to jewelry

stores located in New Jersey. Rather, Emcon was required to service jewelry stores nationwide—some of which were located in Ohio, and other states. Consequently, New Jersey's interest in this action is, at best, equal to, not greater than, that of Ohio's, or that of any other state in which Emcon provided service to Defendants' jewelry stores pursuant to the Vendor Agreement.  Because neither of the *Restatement* factors are met, the Court upholds the Vendor Agreement's designation of Ohio law.[4]

### B.      The Arbitration Clause is Enforceable

Plaintiff next disputes the validity of the arbitration agreement. Despite the Vendor Agreement's selection of Ohio law, Plaintiff argues that "the arbitration clause in the Vendor Agreement violates New Jersey law and is unenforceable with respect to Emcon's statutory and common law claims." Pl's Opposition Brief, at 9. In that connection, Plaintiff contends that the Vendor Agreement's arbitration provision cannot be enforced, because the "arbitration clause fails to specifically give notice that Emcon's claims for statutory violations would be determined by arbitration and/or that Emcon would be deprived of its rights to litigate its disputes." Pl's Opposition Brief, at 9.

Plaintiff's challenge to the language of the Vendor Agreement's arbitration provision is without merit. First, the Court cannot find, nor does Plaintiff cite, any applicable Ohio law that requires an arbitration agreement—entered into by two sophisticated commercial entities—to contain either of the following: (a) an explanation with regard to the difference between arbitration

---

[4]      Emcon also argues that Zales cannot enforce the provisions of the Vendor Agreement, because "there is no written agreement, forum selection or choice of law agreement between Emcon and Zales." Pl's Opposition Brief, at 18. However, as further discussed *infra*, the Court finds that the Vendor Agreement is binding upon both Emcon and Zales, notwithstanding the fact that Zales is not a signatory to the contract.

and litigation; and (b) language specifically indicating that a party's statutory claims cannot be pursued in a judicial forum. Under Ohio law, a statutory claim may be arbitrated, even if that statutory claim is not specifically identified by the arbitration agreement in dispute, so long as the exceptions articulated by the Supreme Court of Ohio in *Acad. of Med. v. Aetna Health, Inc.*[5] are not present. Indeed, Ohio courts routinely uphold and enforce arbitration agreements similar to the one at bar, even where a plaintiff has asserted violations of statutory law not referenced in the parties' arbitration agreement. *See, e.g.*, *Accuride Corp. v. Forgitron, LLC*, No. 1:07 CV 833, 2007 U.S. Dist. LEXIS 60508 (N.D. Ohio Aug. 17, 2007) (requiring statutory claims to be arbitrated, even though the parties' arbitration provision did not specifically indicate that the statutory claims were subject to arbitration); *Wetli v. Bugbee & Conkle, LLP*, No. L-15-1009, 2015 Ohio App. LEXIS 4069 (Ohio Ct. App., Oct. 6, 2015) (enforcing an arbitration provision where the plaintiff asserted statutory claims, although the arbitration provision did not specifically indicate that the plaintiff's statutory claims were subject to arbitration).  Here, the enforcement of the arbitration agreement is appropriate, particularly since Plaintiff does not argue that the Vendor Agreement's arbitration provision violates Ohio law, and the Court cannot independently find that any of *Acad. of Med.*'s exceptions apply.

However, in an attempt to invalidate the parties' arbitration agreement, Plaintiff primarily cites New Jersey law.  Plaintiff's arguments based on New Jersey's public policy are wholly misplaced, because, as discussed above, New Jersey law is inapplicable given that Ohio law

---

[5]     Specifically, in *Acad. of Med. v. Aetna Health, Inc.*, 108 Ohio St. 3d 185 (2006), the Supreme Court of Ohio held that a statutory claim may be subject to arbitration, if the statutory claim: (a) was not explicitly excluded from the arbitration provision's scope, (b) Congress did not intend for the statutory claim to be litigated; and (c) the statutory claim cannot be maintained without reference to the contract. Significantly, the Supreme Court of Ohio does not require a statutory claim to be specifically identified by the arbitration clause that a party seeks to enforce.

governs. Nonetheless, even if New Jersey law applied, it would appear that the Vendor Agreement's arbitration provision would still be valid.[6]  Plaintiff argues that the parties' arbitration provision cannot be enforced, citing *Atalese v. U.S. Legal Services Group, L.P.*, 219 N.J. 430 (2014) and *Garfinkel v. Morristown Obstetrics & Gynecology Associates, P.A.*, 168 N.J. 124 (2001). Pl's Opposition Brief, at 9-19. More specifically, Plaintiff relies on *Atalese* and *Garfinkel* for the proposition that arbitration provisions must include language indicating that a plaintiff is waiving its right to seek relief in court, and that any statutory claims to be arbitrated must be specifically identified in the agreement; these types of language are absent from the arbitration agreement here. Pl's Opposition Brief, at 9-19.  Although the New Jersey Supreme Court has yet to give guidance on the application of *Atalese* and *Garfinkel*, New Jersey state courts and courts in this district have all limited the holdings in *Atalese* and *Garfinkel* to the consumer and employment contexts in which those cases were decided. Indeed, neither *Atalese* nor *Garfinkel* involved a commercial transaction with two sophisticated entities, such as the transaction here involving Emcon and Sterling. According to at least one subsequent Appellate Division decision in *Gastelu v. Martin*, *Atalese*'s analysis should be confined to arbitration agreements that seek to bind "*an average member of the public*." *Atalese*, 219 N.J. at 442 (emphasis added). The *Gastelu* court noted:

> "Parties to a commercial contract can express their intention to arbitrate their disputes rather than litigate them in court, without employing any special language . . . . In the present case . . . we are dealing with commercial business transaction and, therefore, the standard is not as stringent [as the one put forward in *Atalese*]."

---

[6]     Although the Court is summarily addressing Plaintiff's New Jersey policy related arguments, I note that the decisions made in this Opinion are not dependent upon my discussion of New Jersey's public policy in the context of arbitration clauses.

No. A-0049-14T2, 2015 N.J. Super. LEXIS 1639, at *14 & n.4, (App. Div. July 9, 2015).[7]

Similarly, the weight of authority in this district undermines Plaintiff's reliance on *Garfinkel*. Indeed, numerous New Jersey courts have refrained from applying *Garfinkel*, a case which sought to "abolish discrimination in the workplace," *Garfinkel*, 168 N.J. at 130, outside of the employment context. *See, e.g.*, *Hayden v. Hartford Life Ins. Co.,* No. 10-3424, 2010 U.S. Dist. LEXIS 130079, at *18 (D.N.J. Dec. 8, 2010) ("Thus, it was only in the context of a statutory employment claim that *Garfinkel* requires a clear and explicit waiver of a statutory right."); *Alfano v. BDO Seidman, LLP,* 393 N.J. Super. 560, 576 (App. Div. 2007) (concluding that *Garfinkel's* clear waiver requirement is only applicable where a plaintiff seeks to enforce its statutory employment rights); *EPIX Holdings Corp. v. Marsh & McLennan Companies, Inc.*, 410 N.J. Super. 453, 476 (App. Div. 2009) (finding that the requirements set forth in *Garfinkel* do not apply outside the special area of a plaintiff's enforcement of statutory employment claims") (citations and quotations omitted).

I note that the Third Circuit, in a nonbinding, unpublished decision in *Flaghouse, Inc. v. Prosource Dev., Inc.*, 528 Fed. Appx. 186 (3d Cir. 2013), has, without any discussion of the prior authorities that I have just referenced, applied *Garfinkle's* standard to an arbitration agreement

---

[7]     In a supplemental letter, Plaintiff refers the Court to the unpublished decision of *Blackman & Co. v. GE Bus. Fin. Servs.*, No. 15-7274, 2016 U.S. Dist. LEXIS 87904 (D.N.J. July 7, 2016), noting that the court, there, applied *Atalese* to a dispute between commercial entities. *See* Letter from Emcon to the Court (dated Sept. 26, 2016). The Court, however, disagrees, as *Blackman* primarily relies on ordinary principles of contract interpretation—not the standard articulated in *Atalese*—in resolving the parties' dispute. *Blackman & Co*, 2016 U.S. Dist. LEXIS 87904, at *7 (merely noting, in a parenthetical, that *Atalese* was cited by a case which the *Blackman* court referenced in support of a general contract principle). Therefore, there is no basis to invalidate the Vendor Agreement's arbitration provision based on *Blackman's* limited discussion of *Atalese*.

within a commercial contract.  I recognize that The Third Circuit found that in a commercial arbitration provision, "statutory remedies not explicitly included in an arbitration clause are not subject to arbitration." *Id.* at 190.  But, such a holding is seemingly contrary to New Jersey state court decisions that were decided after *Garfinkle*. *See*, *supra*.  In any event, because my finding as to whether the arbitration clause here is valid is not based on New Jersey law, I need not definitively reach a resolution of these issues.  Instead, since the arbitration clause here does not offend Ohio contract principles, the parties' agreement to arbitrate is valid.

### C.    Zales and Albanese may Enforce the Arbitration Agreement

Finally, both Zales and Albanese seek to enforce the Vendor Agreement's arbitration provision against Plaintiff. In that regard, Zales argues that it is an affiliate of Sterling, and may compel arbitration as a third-party beneficiary to the Vendor Agreement. Defendants' Reply Memorandum of Law ("Defs' Reply"), at 8-11. Similarly, because Albanese is an agent of Sterling, a signatory to the Vendor Agreement, Defendants contend that Emcon's claims against Albanese are also subject to arbitration. Defs' Reply, at 11-12.

In response, Plaintiff argues that Zales and Albanese cannot compel arbitration under the Vendor Agreement because "the agreement to arbitrate, at most, was only made as between Emcon, Sterling and the three (3) specific Sterling affiliates identified in Paragraph 6 of the Vendor Agreement." Pl's Opposition Brief, at 20. In other words, Plaintiff contends that Zales and Albanese are not signatories to the Vendor Agreement, and neither of them are third-party beneficiaries in the Agreement. Pl's Opposition Brief, at 21. Specifically, as to Zales, Plaintiff contends that Zales is not a third-party beneficiary to the Vendor Agreement, despite language contained in the Vendor Agreement indicating that Sterling's affiliates "shall benefit from the provisions of [the] Agreement," because "public records reveal that Signet (Sterling's parent

company) only purchased the assets of Zales in May 2014—more than 2 years after the Vendor Agreement became effective." Pl's Opposition Brief, at 21. As such, Plaintiff asserts that Zales was not within the contemplation of the parties when the arbitration agreement was executed. Pl's Opposition Brief, at 21. And, with respect to Albanese, Plaintiff contends that Albanese is not covered by the Vendor Agreement's arbitration provision because "he is a Signet employee [as opposed to Sterling's employee] . . . and is not necessarily an agent of Sterling or Zales." Pl's Opposition Brief, at 25. The Court disagrees, and finds that both Zales and Albanese can enforce the arbitration provision of the Vendor Agreement.

Ohio courts have used the "intent to benefit" test in determining whether a third party is an intended beneficiary of a contract, as opposed to an incidental beneficiary who does not have any enforceable rights under a contract. *See Huff v. FirstEnergy Corp.*, 130 Ohio St. 3d 196 (2011); *Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St. 3d 36 (1988); *Norfolk & Western Co. v. United States*, 641 F.2d 1201 (6th Cir. 1980). Under this test, "if the promisee . . . intends that a third party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract." *Huff*, 130 Ohio St. 3d at 200 (citing *Hill*, 36 Ohio St. 3d at 40) (internal quotations omitted). Alternatively, "if the promisee has no intent to benefit a third party, then any third-party beneficiary to the contract is merely an 'incidental beneficiary,' who has no enforceable rights under the contract." *Id.* (citing *Hill*, 36 Ohio St. 3d at 40) (internal quotations omitted). Thus, "Ohio law . . . requires that for a third party to be an intended beneficiary under a contract, there must be evidence that the contract was intended to directly benefit that third party." *Id.* Typically, "the parties' intention to benefit a third party will be found in the language of the agreement." *Id.*

Here, the plain language of the Vendor Agreement contemplates that the parties, Emcon and Sterling, intended for Zales to benefit from the contract. Plaintiff contends that Zales does not have standing to compel arbitration because the Vendor Agreement only defines, other than Sterling, three of Sterling's affiliates that can enforce the Agreement's provisions, and Zales is not among them. However, Plaintiff seemingly misconstrues a relevant portion of the text contained within the Vendor Agreement's "third party beneficiaries" paragraph, which states:

> 6.   <u>Third Party Beneficiaries</u>. The parties agree and acknowledge that some of the goods may be provided to, some of the premises involved and, some of the confidential information provided, may be provided by or belong to, affiliates of Sterling, *including without limitation* Sterling Inc., Sterling of Ohio, Inc., and Sterling Jewelers LLC (collectively, "Sterling Affiliates") . . . .

Albanese Dec., ¶ 6, Ex. A, ¶ 6. (emphasis added). While this paragraph identifies three specific Sterling affiliates, the aforementioned list is explicitly without limitation. In other words, the provided list of affiliates is not exhaustive or exclusive; rather, it is illustrative. Accordingly, the plain and ordinary language of the Vendor Agreement does not exclude those affiliates that are not mentioned, such as Zales, from enforcing its arbitration provision as a third-party beneficiary. *See Auer v. Commonwealth*, 46 Va. App. 637, 645 (Va. Ct. App. 2005) ("Generally speaking, the word 'include' implies that the provided list of parts or components is not exhaustive and, thus, not exclusive.") (citing *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)). Nor does the timing of Zales being acquired by Signet preclude Zales from being a third-party beneficiary, as Plaintiff contends. Although Signet purchased Zales' assets after the Vendor Agreement became effective, the language of the Vendor Agreement is sufficiently broad to cover those entities that are acquired after the execution of the Agreement. Indeed, the Vendor Agreement states that "*affiliates* of Sterling . . . shall benefit from the provisions of [the Vendor] Agreement." Albanese Dec., ¶ 6, Ex. A, ¶ 6 (emphasis added). Such benefits allow "any Sterling

*Affiliate* injured or affected by any breach hereof by Vendor [to] enforce [the Vendor] Agreement against Vendor," including the right to compel arbitration pursuant to the terms and conditions of the Vendor Agreement. Albanese Dec., ¶ 6, Ex. A, ¶ 6 (emphasis added). Significantly, the Agreement is silent as to timing. Thus, the fact that Zales was acquired after the Vendor Agreement was in effect does not change Zales' status as an affiliate of Sterling, and Plaintiff cites no authority to support its contention that a party must have existed at the time when an agreement was executed to be considered a third-party beneficiary. Rather, Zales qualifies as a third-party beneficiary to the Vendor Agreement because the contract contemplated that Sterling's affiliates—present or future—would benefit under the contract terms. [8] Therefore, Zales may enforce the Vendor Agreement's arbitration provision.

This Court also rejects Plaintiff's assertion that Plaintiff is not bound to arbitrate with Defendant Albanese. Ohio Courts have consistently held that non-signatories of arbitration agreements may be bound by the agreement under traditional contract and agency principles. *See Arnold v. The Arnold Corp.*, 920 F.2d 1269, 1281-82 (6th Cir. 1990); *Manos v. Vizar*, No. 96 CA 2581-M, 1997 Ohio App. LEXIS 3036 (Ohio Ct. App., July 9, 1997); *Genaw v. Lieb*, 2005-Ohio-807 (Ohio Ct. App., Feb. 25, 2005). More specifically, these courts have reasoned that, since a principal is bound under the terms of a valid arbitration clause, its agents, employees, and

---

[8] Emcon disputes whether Zales is a wholly owned subsidiary of Sterling. However, Emcon concedes that Sterling and Zales are under the control of the same corporate parent, Signet. Even with that concession, Emcon insists that two sibling corporations are not affiliated under traditional contract terms. This is incorrect. Under Ohio law, Zales is an affiliate of Sterling. *Bond Safeguard Ins. Co. v. Dixon Builders I, LLC*, 2012-Ohio-3313, ¶38 (Ohio Ct. App., July 23, 2012) ("The term affiliate is commonly defined to include a company effectively controlled by another *or associated with others under common ownership or control*.") (emphasis in original) (citing *Webster's Third New International Dictionary* (1993); *Black's Law Dictionary* 63 (8th Ed.2004) ("defining 'affiliate' to include a 'corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.'")).

representatives are also covered by the terms of such agreements. *Arnold*, 920 F.2d at 1281-82 (finding that the plaintiff's securities law and RICO claims against non-signatory officers of the defendant corporation and an independent broker dealer were arbitrable); *Manos*, 1997 Ohio App. LEXIS 3036, at *5 (finding that the plaintiff's negligence action against a non-signatory employee of the defendant home-inspection company were arbitrable); *Rivera v. Rent A Center, Inc.*, 2015-Ohio-3765, P24 (Ohio Ct. App., Sept. 17, 2015) (finding that the plaintiff's discrimination action against his employer and his non-signatory supervisor were arbitrable).

Here, the record reflects that Albanese was an employee of Sterling, a signatory to the Vendor Agreement. In a conclusory fashion, Plaintiff contends that "with respect to Albanese, he is a Signet employee . . . and is not necessarily an agent of Sterling or Zales." Pl's Opposition Brief, at 25. However, at the time Emcon issued the invoices that are the subject of this dispute, Albanese was the "Director of Facility Maintenance" for Sterling and Zales. Albanese Dec., ¶ 4; Compl. ¶ 30. In fulfilling that role, Albanese "was responsible for directing and/or managing the repair and maintenance activity for the Sterling and Zales facilitates located throughout the United States." Albanese Dec., ¶ 5. This entailed "working with vendors such as Emcon to, among other things, ensure that the Vendor Agreement was being properly serviced and invoiced." Albanese Dec., ¶ 8. In other words, Albanese "was involved in the review of invoices that Emcon issued to Sterling and Zales and the determination of whether they were payable under the Vendor Agreement." Albanese Dec., ¶ 8. Accordingly, Albanese's responsibilities as the Director of Facility Maintenance clearly demonstrate that he was an employee of Sterling. Plaintiff even acknowledges this fact—that Albanese served as a representative of Sterling—in its Complaint: "In August 2014, Albanese was named Director of Facilities for Sterling and for Zale." Compl. ¶ 30. Count Five of the complaint also states that "[f]rom August 2014 and thereafter, Zales and

Sterling, *through and/or including Albanese*, engaged in unconscionable commercial practices, deceptions, fraud and misrepresentations in violation of common law, and statutory law . . . . " Compl. ¶ 31 (emphasis added). Plaintiff cannot treat Albanese as a representative of Sterling when drafting its Complaint, then later argue that Albanese "is not necessarily an agent of Sterling or Zales" for the purposes of circumventing the Vendor Agreement's arbitration provision.

Nor can Plaintiff contend that the claims against Albanese are not arbitrable since "his personal liability (apart from any corporate liability) is . . . at issue." Although Plaintiff asserts claims against Albanese in his individual capacity, Plaintiff's allegations, regardless of Albanese's own motives, are in connection with his role and responsibilities as the Director of Facilities. Pl's Opposition Brief, at 25. Hence, Plaintiff cannot circumvent the arbitration agreement by asserting claims against Albanese in his individual capacity, if Albanese's alleged wrongful conduct relates to his work obligations as a representative of Sterling. *Arnold*, 920 F.2d at 1281-82. (quoting *Arnold*, 668 F. Supp. at 629). Indeed, if the Court were to find otherwise, Plaintiff could potentially avoid the practical consequences of an agreement to arbitrate by simply asserting individual claims against agents of signatories. *See Arnold*, 920 F.2d at 1281. Accordingly, based on the foregoing reasons, the Court finds that Albanese served as a representative of Sterling, a signatory to the Vendor Agreement, and, like Zales, he may also compel arbitration against Plaintiff.

### D.     The Arbitration Clause is not Unconscionable

Finally, without addressing the law on unconscionability, Emcon asserts that "[t]he arbitration clause is . . . illusory and impossible to perform such that it would be unconscionable to be enforced in the manner Defendants suggest." Pl's Opposition Brief at 26-27. In support, Emcon points to section 24 or the arbitration provision, which states:

> The need for and scope of formal discovery will be determined by agreement of the parties or, if the parties are unable to agree, the Arbitration Panel . . . . In the event

of a formal hearing, each party shall only be allowed a maximum of eight (8) hours
to present evidence and/or witnesses.[9]

Albanese Dec., ¶ 6, Ex. A, ¶ 24. Plaintiff reasons that, given the nature of its business, it cannot be

denied discovery, nor can it can it reasonably present its claim and defense in arbitration in only

eight hours. However, Plaintiff's unconscionability argument fails, as it only focuses on the terms

of the arbitration provision, and cites to very little Ohio law.

Under Ohio law, "a contract clause is unconscionable where there is the absence of

meaningful choice on the part of one of the parties to a contract, combined with contract terms that

are unreasonably favorable to the other party." *Sikes v. Ganley Pontiac Honda, Inc.*, 2004-Ohio-

155, ¶10 (Ohio Ct. App., Jan. 15, 2004) (citing *Collins v. Click Camera & Video, Inc.*, 86 Ohio

App. 3d 826, 834 (Ohio Ct. App., Mar. 24 1993)). Stated differently, in establishing that a contract

is unconscionable, "the complaining party must demonstrate: 1) 'substantive unconscionability,'

i.e. contract terms are unfair and unreasonable, and 2) 'procedural unconscionability,' i.e. the

individualized circumstances surrounding the contract were so unfair as to cause there to be no

voluntary meeting of the minds." *Sikes*, 2004-Ohio at ¶10. (citing *McCann v. New Century Mortg.

Corp.*, 2003-Ohio-2752, ¶ 41 (Ohio Ct. App., May 29, 2003)). Accordingly, "[s]atisfying one prong

of the test and not the other precludes a finding of unconscionability." *Id*. (citing *DePalmo v.

Schumacher Homes*, No. 2001CA2722002, Ohio App. LEXIS 821, at *5-6 (Ohio Ct. App., Feb.

19, 2002)).

---

[9]       In a footnote, Plaintiff asserts that section 24 is "illegal" because that clause "compels
arbitration or litigation to occur in a state other than where the improvements to real property were
made and/or it mandates that [Ohio law apply] as opposed to the law of the state where the real
property is located." Pl's Opposition Brief, at 28 n. 10. However, this argument is without merit,
as the contract between the parties was for maintenance, not capital improvements. Albanese Dec.,
¶ 6, Ex. A ("In compliance with the Vendor Agreement and the Terms and Conditions, the Vendor
will provide Sterling with goods in the form of repair and maintenance services [for certain jewelry
locations.]").

As an initial matter, the Supreme Court, in "*Concepcion*[,] explicitly rejected the argument that discovery restrictions in arbitration agreements are unconscionable." *Wallace v. Red Bull Distrib. Co.*, 958 F. Supp. 2d 811, 824 (N.D. Ohio 2013) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341-42). And, more importantly, there is nothing in the record demonstrating the second element of the unconscionability test. Indeed, Emcon appears to be arguing that the arbitration provision's terms are not commercially reasonable, given the context of the transaction involved. However, Emcon fails to establish how the contract is procedurally unconscionable. Emcon does not "describe the specific circumstances surrounding the execution of the contract between the . . . parties." *Sikes*, 2004-Ohio at ¶12. Nor does Emcon show that there were disparities between the parties with regard to their business acumen, experience, or bargaining power. Nevertheless, the Court would be hard-pressed to find that such inequalities existed, as Emcon, a sophisticated business entity, provides nationwide facilities management services, and presumably transacts with large companies regularly. Accordingly, this Court cannot find that the Vendor Agreement's arbitration provision is unconscionable.[10] *DePalmo*, 2002 Ohio App. LEXIS 821, at *5 (holding that the agreement's arbitration clause was not unconscionable

---

[10]     In relevant part, Section 24 of the Vendor Agreement states: "Notwithstanding the agreement to arbitrate in this Section 24, claims within the monetary jurisdiction of Ohio's Municipal Courts, actions for specific performance, and/or actions for preliminary injunctive relief may be pursued by either party, at the claimants option, in a court of competent jurisdiction in Summit County, Ohio, or pursued in arbitration as set forth above." Albanese Dec., ¶ 6, Ex. A. Plaintiff contends that this provision renders the arbitration agreement unenforceable, because it creates an ambiguity as to what claims are subject to arbitration. Pl's Opposition at 16, 26-27. The Court disagrees. Section 24's language does not create any uncertainty; that section clearly identifies which claims can be pursued in court, rather than arbitration.

because appellants "failed to "produce evidence of disputed facts on one prong of the unconscionability test").[11]

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to stay proceedings and compel arbitration is **GRANTED**.

Dated: December 14, 2016

/s/ Freda L. Wolfson
Freda L. Wolfson
United States District Judge

---

[11]     Plaintiff does not argue that the claims it has brought in this case do not fall within the scope of the arbitration agreement.  Rather, the gravamen of Plaintiff's arguments centers on the validity of the arbitration agreement.  Since neither party addresses this issue, I need not decide it. *See, e.g., Swan v. Santander Consumer USA*, No. 14-1906, 2015 U.S. Dist. LEXIS 32348 (D. Md. Mar. 17, 2015); *Monserrate v. Hartford Fire Ins. Co.*, No. 14-149, 2014 U.S. Dist. LEXIS 116023 (M.D. Fla. Aug. 20, 2014); *Gokhberg v. Sovereign Bancorp, Inc.,* 2011 U.S. Dist. LEXIS 98930 (E.D. Pa. Sep. 1, 2011); *Volpe v. Jetro Holdings*, No. 08-3521, 2008 U.S. Dist. LEXIS 93220 (E.D. Pa. Nov. 14, 2008).